## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )     Crim. Docket No. 04cr10361-NG |
| | ) |
| JOHN HANDY, | ) |
| Defendant. | ) |

GERTNER, D.J.:

### MEMORANDUM AND ORDER RE: MOTION TO SUPPRESS
May 11, 2007

This motion concerns the reasonable limits of a search of a home conducted pursuant to a warrant. Defendant John Handy ("Handy") was charged as a felon in possession of a firearm, in violation of 18 U.S. §922(g)(1). He moves to suppress the fruits of a warrant-authorized search of 41 Weston Street, Brockton, Massachusetts, on June 2, 2004, generated by the Massachusetts state police, based on the inadequacy of the warrant affidavit and the scope of the search.

A few background facts are relevant to put this claim in context. The case began with information from a confidential informant ("CI"). The CI claims he had been buying drugs from a man named "Joe." Two controlled buys later produced very small amounts of drugs. Nevertheless, the state authorities obtained a warrant to search the house the CI identified as "Joe's." A search was executed, which yielded a very small amount of drugs and a gun lodged under a floor board in the home.

Charges were brought against Handy for illegal possession of drugs and a gun in state court. Handy pled guilty and was

sentenced to six months in jail.  At the conclusion of Handy's sentence, the United States Attorney's Office began this prosecution based on the same facts.  He faces a potential 15 year sentence.[1]

While I had serious concerns about the fairness of this prosecution, those concerns cannot affect the motion to suppress before me.  Looking only at the motion to suppress, I am obliged to deny it [document #21].

**I.    FACTUAL BACKGROUND**

The current charge stems from a search at 41 Weston Street, during which a firearm and personal mail – neither of which were mentioned in the warrant – were found and seized.

**A.    The Warrant Application**

Massachusetts State Police Trooper Edward McDonald ("McDonald") received information from the CI about an alleged drug dealer named "Joe."  In the warrant affidavit, McDonald attested that the CI, who had proven reliable in the past, told police that he had been buying heroin from "Joe" for a year at public locations and at "Joe's" residence at 41 Weston Street.

Trooper McDonald could not verify that "Joe" lived at the Weston Street address.  The telephone number the CI used to reach "Joe" was not associated with that address.  Trooper McDonald

_____

[1] I inquired about the legitimacy of this dual prosecution.  See Memorandum and Order Requesting Briefing on Dual Prosecution Issue (August 1, 2006).  After a hearing, defendant withdrew any challenge to the prosecution.

learned that the single-family home belonged to a woman named Shirrel Carrigan, who had been arraigned fourteen times, twice for narcotics offenses.  Defendant points out that these drug arraignments were nearly 19 years old at the time of the warrant application and that all of Carrigan's offenses were more than nine years old.  Trooper McDonald did not disclose that information in the warrant application.

Trooper McDonald used the CI to conduct two controlled drug buys (May 22 and 24, 2004).  Each time, the CI called "Joe's" cell phone and arranged to purchase heroin.  Trooper McDonald gave the CI money, searched him to ensure he was drug-free, and then watched the CI enter the Weston Street house.  Trooper McDonald later met with the CI to retrieve the heroin he had allegedly purchased from "Joe."

The warrant affidavit does not mention that the two drug purchases had been merely .23 and .15 grams of three and four percent heroine, respectively.  See Def. Ex. 13.  Nor does it mention that Trooper McDonald did not observe the CI the entire time between when the CI allegedly bought the drugs and the time he showed the drugs to McDonald.[2]

---

[2] Defendant disputes Trooper McDonald's version of events.  See Ex. E to Def. Mot. to Suppress.  In that affidavit, defendant states that he "recognizes" the CI in McDonald's affidavit as "Scott."  He says that he and Scott would go looking for heroin together, but he never sold Scott heroin at 41 Weston Street.  He says that they went to the house together twice.  According to Defendant, the CI gave him drugs on one of those occasions, but Defendant never sold the CI drugs at 41 Weston Street.

Based on Trooper McDonald's affidavit, a magistrate issued a
warrant to search 41 Weston Street for heroin, materials and
equipment used in the manufacturing or distributing of drugs,
books, records, and monies used for those purposes, and proceeds
of any sale of controlled substances.  See Gov. Ex. 2.

**B. <u>The Search</u>**

Police did not execute the warrant until June 2, 2004, a
week after it had been issued. Trooper McDonald testified that
they waited to execute the warrant because they had to use the CI
to ensure that "Joe" would be home at the time of the search.
(Hr'g Tr. 40-41, May 10, 2006). Arriving at the house on June 2,
Police knocked and announced their presence, and hearing no
response, they forcibly entered.  (Hr'g Tr. 11-12, May 10, 2006).

The testimony about the initial moments of the search was
inconsistent.  Trooper McDonald testified that he did not see
Handy until later, when officers brought Handy to the living
room. (Hr'g Tr. 56, May 10, 2006). Both Trooper James Arroyo
("Arroyo") of the Massachusetts State Police and Detective George
Khoury ("Khoury") of the Brockton Police Department said they did
not recall seeing anyone on the first level when they entered.
(Hr'g Tr. 13, 41, June 9, 2006).  Detective Khoury further stated
that "the first time I saw Mr. Handy was coming out of the
bedroom" [on the second floor].  <u>Id.</u> at 55.  Lieutenant Anthony
Thomas of the state police, who said he was toward of the back of
the pack entering the house, also did not recall seeing anyone in

the house at the time of entry, nor did Detective Thomas Keating

("Keating") of the Brockton Police Department, who was fourth or

fifth into the house, or Sergeant James Gilmore ("Gilmore") of

the state police, who was second or third into the house. Id. at

85, 127-28, 14-47.

Detective Jeffrey Costello ("Costello"), the only one to

recall seeing someone on the first floor of the house stated that

he was probably fourth in line entering the house. He saw

someone going up the stairs, "probably in between walking and

running," but said he could not tell whether that individual was

male or female. (Hr'g Tr. 15-16, 18, July 11, 2006). He took no

notes of the incident and said the first time he thought about

the June 2004 search was a few weeks before his July 2006

testimony. (Hr'g Tr. 22, July 11, 2006). He also recalled

entering the home from the right side, (Hr'g Tr. 22-23, July 11,

2006), in contrast to the testimony of all other officers and the

statement in the warrant itself that the door to the house was on

the left. See, e.g., (Hr'g Tr. 15, May 10, 2006); Gov. Ex. 2.

Police later identified both Defendant John Handy and his

fifteen year-old son, Jekeith Carrigan, in the house. They

photographed the latter and allowed him to leave. (Hr'g Tr. 90-

91, June 11, 2006). Handy was handcuffed and held while the

police executed their search.  No one else was home. (Hr'g Tr. 14, May 10, 2006).[3]

During the search, officers seized the firearm at issue in this case, a single bag of heroin consistent with personal use, and three pieces of personal mail with Defendant's name and the 41 Weston Street address.

### 1.    Drugs

Trooper Arroyo recovered one "twist" of heroin in a plastic bag in the second floor hallway. See Gov. Ex. 3.  He did not recall whether the drugs were found before of after the gun or how long after the search began he found the drugs. (Hr'g Tr. 13-14, 16, June 9, 2006).  Detective Khoury also did not know whether the gun or drugs were found first. Id. at 73.

The police did not find evidence of drugs sufficient to uphold a charge of distribution; the only heroin found was a single .18 gram bag of 10% heroin.  See Def. Ex. 13.  Trooper McDonald testified that this amount was consistent with the quantities that the CI had been purchasing from "Joe."  (Hr'g Tr. 59, May 10, 2006).[4]

### 2.    Gun

---

[3] An unidentified woman arrived at the home as police were leaving, but at this point all relevant events, including the seizure of the gun and the mail, had already occurred.  See (Hr'g Tr. 91, June 9, 2006).

[4] The confidential informant purchased .23 grams of heroin of 3% purity on one occasion and .15 grams of heroin of 4% purity on another. See Def. Ex. 13.

Police searching on the second floor came upon a closed door. The door opened to reveal a bedroom with Handy inside.[5]

The officers found the gun in a utility access point deep beneath a floorboard. No drugs or other contraband were found near the gun. Detective Khoury, who found the gun, described the location: "It was a hardwood floor, and it was clearly a different pattern. It was like a square pattern on the floor that was different from the pattern on the rest of the hardwood floor. It looked like it could have been a door of some sort, trap door of some sort, and I just lifted the door open. . . . I wouldn't consider this a hidden compartment. It was just too easy to locate." (Hr'g Tr. 43-44, June 9, 2006).

Trooper McDonald, in contrast, testified that the door in the floor "would have been hard to detect had someone just been walking into the room without further observation." (Hr'g Tr. 31, May 10, 2006). Detective Khoury could not recall whether there had been a rug covering the floor at the time, explaining that "There might have been like a little throw rug or something, but I'm not positive." (Hr'g Tr. 61, June 9, 2006). He testified that he was able to lift the floor, a single piece that lifts up like a door, with his fingers.[6] (Hr'g Tr. 62, June 9, 2006).

---

[5] Testimony was ambiguous as to how the door was opened, though it appears that the door was not forced and no damage was done. (Hr'g Tr. 41-42, June 9, 2006).

[6] Detective Khoury's testimony about the floor was clearly untrue. He testified:

Inside the compartment, Detective Khoury found the gun.  It was on a ledge three feet below the floor, out of arms' reach.  "It was down there pretty – it was further than my arms reached," Khoury testified.  Id. at 64.  He needed a "coat hanger or something" to retrieve the gun, a loaded Smith & Wesson revolver in a black leather case.  Id. at 43, 64.  No drugs or other contraband were found anywhere near the gun.

Detective Khoury initially left the gun in place so that, he said, it could be photographed.  Id. at 65.  It appears, however, that no such photos exist; the closest photograph the government produced shows a gun in its holster next to the open floor.  See Def. Ex. 13.  He then seized the gun and brought it to the evidence officer on the first floor.  At the time of the seizure, Khoury "wasn't familiar with" Handy.  He did not know Handy's identity or have any information that the gun was either illegally possessed or tied in any way to drugs.  Id. at 68-69.

-----

```
Q:   And these boards, how many were there?
A:   It wasn't really boards, it was like a door
     probably about, I don't know, like 18 inches or
     so.
Q:   And this is a single piece that lifts up out of
     the floor basically and you put it aside?
A:   Yes.
```

(Hr'g Tr. 62, June 9, 2006).

The Court compared the police photo, Gov. Ex. 11, which shows the open floor to the defendant's later photo of the same location with the floor compartment closed.  The police photo clearly reveals two separate floorboards lifted out of the floor, not a "single piece" as Detective Khoury testified.  These two boards are visible in the center and left sides of the police photo taken at the time of the search.

Police did not have any reason to believe prior to the search that the bedroom in question was Handy's. They later reached that conclusion based on the fact that they found Handy and some mail with his name on it in that bedroom and that there was men's clothing in the room. (Hr'g Tr. 24, 58, May 10, 2006). The room also contained women's clothing. <u>Id.</u> at 58.

### 3. **Personal Papers**

Detective Keating testified that he and Trooper Coleman seized several pieces of mail, which they found in the bureau drawers in the bedroom. The mail was taken, according to Detective Keating, "to turn in for evidence for the trial" and "to show that John Handy had some standing in that room with his name and address of 41 Weston Street." (Hr'g Tr. 132, June 9, 2006). Police seized the mail after the gun was found. <u>Id.</u> at 131.

Trooper McDonald explained that the paperwork was taken "to show that John Handy may have had constructive possession over the bedroom." (Hr'g Tr. 20, May 10, 2006). Although the three pieces of mail taken all included Handy's name and the Weston Street address, Detective Keating acknowledged that there may also have been other mail or papers with Handy's name and a different address, which police chose not to seize. (Hr'g Tr. 140, June 9, 2006).

### 4. **Aftermath of the Search**

Police arrested Handy and took him to the Brockton police station. He was charged in state court and pled guilty to possession of a firearm without a license. He served six months on that charge. The office of the United States Attorney subsequently decided to prosecute Handy for possession of the very same gun.[7]

## II.  ANALYSIS

Handy makes several arguments in favor of suppression. He asserts that the warrant application was flawed, that the scope of the search was excessive, and that the seizure of the gun and the mail were not legitimate. I will address each of these arguments in turn.

### A.  The Warrant Application

Defendant suggests that the warrant application did not establish probable cause or, alternatively, that the warrant affidavit contained material omissions. A warrant application must demonstrate probable cause to believe that a particular person has committed a crime and that enumerated evidence of that crime will likely be found at the place to be searched. United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999); United States

---

[7] Sheila O'Hara of the Bureau of Alcohol, Tobacco, and Firearms helped investigate the case for the U.S. Attorney's office. She testified that when she was informed that the case would be prosecuted in federal court despite the state court conviction she was "a little surprised." (Hr'g Tr. 41, July 11, 2006). Agent O'Hara explained: "I said can we do this because I had considered that he had already pled guilty in state court and then she walked me through this whole motion process, and I was – I had never experienced it in my probably, what, 17 years on the job back then so that it was all new to me." Id.

v. Zayas-Diaz, 95 F.3d 105, 110-11 (1st Cir. 1996).  Under this
standard, a magistrate must consider the totality of the
circumstances as set forth in the warrant application in
determining whether a reasonable person would find that there
exists "a fair probability that contraband or evidence of a crime
will be found in a particular place."  Feliz, 182 F.3d at 86
(quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)(internal
quotation omitted)).

    Where, as here, a warrant application hinges on information
from a confidential informant, the affidavit must provide
information that the issuing magistrate can use to assess the
credibility of the informant's reports.  United States v.
Barnard, 299 F.3d 90, 93 (1st Cir. 2002).  An informant's
credibility should be assessed based on the totality of the
circumstances.  Gates, 462 U.S. at 230-31, 238.

    Trooper McDonald based his affidavit on two controlled buys
from a known CI.  The informant, according to McDonald, had led
McDonald to successful arrests in the past and McDonald
corroborated the CI's information by observing two controlled
buys.  It is true, as defendant argues, that McDonald did not
observe the CI leaving the home after the drug buys.  However I
find defendant's suggestion that this invalidates the controlled
buys to be unavailing.  Based on McDonald's affidavit, the
magistrate had sufficient information to find probable cause to
issue the warrant.

Defendant also contends that the warrant application contained material omissions.  He suggests omissions concerning the CI's heroin purchases at 41 Weston Street, the nature of Sherill Carrigan's criminal record, and details about the cellular phone the CI used to contact "Joe."  And while the defendant does not mention it, the warrant failed to mention that each of the two controlled buys was for .2 grams of heroin that was only 3-4% pure.

Because a warrant affidavit is presumed to be valid, see United States v. Grant, 218 F.3d 72, 77 (1st Cir. 2000) (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)), defendant must establish that statements in the affidavit were made with "reckless disregard for the truth" or that "technically accurate statements . . . have been rendered misleading by material omissions."  Id. (quoting Franks, 438 U.S. at 155 and United States v. Scalia, 993 F.2d 984, 987 (1st Cir. 1993)) (internal quotations omitted).  Because defendant has established neither material omissions nor a reckless regard for the truth, I find that the warrant was valid.

### B.   **Scope of the Search**

The scope of the search, however, creates serious reason for concern.  Police were searching for drugs, pursuant to two buys from a confidential informant.  The scope of a search must be reasonable, in light of the subject of the police search.  The

question here is whether police exceeded the reasonable scope of the warrant when they lifted the floorboards in the bedroom.

Police had no evidence that "Joe," the target of their investigation, was a substantial dealer.  Each of the drug buys by the confidential informant consisted of only a very small amount of heroin consistent with personal use.  Two drug purchases, of .23 and .15 grams of heroine of only three and four percent purity respectively, could not reasonably have led police to believe they were tracking a major drug dealer.

I am concerned that suspicion of such small amounts of drugs could be used to justify a search of the kind involved here. Police removed two floorboards.  At the time the floor was laid open, it is not clear that any drugs had been found on site at all, and if they had been, it was only a small bag, again consistent with personal use.  Furthermore, those drugs were not found in the bedroom.

The First Circuit, however, has broadly interpreted the reasonable scope of a warrant.  In United States v. Rutkowski, the court allowed a search "behind a layer of wall insulation in the basement" as part of a search warrant for stolen guns, jewelry, and coins. 877 F.2d 139, 140 (1st Cir. 1989).  The court observed:

> [T]here is no meaningful evidence that the
> search exceeded the scope and intensity which
> the warrant unauthorized. . . the warrant
> authorized a search of the entire premises
> for easily-hidden objections like jewelry and

coins.  In executing the warrant, therefore,
the troopers had every right to examine the
basement and to inspect the area behind the
wallboard.

Id. at 141.  See also United States v. Caggiano, 899 F.2d 99, 103

n.5 (1st Cir. 1990) (noting, even though defendant did not

contest the scope of the search, that "[i]n executing a warrant

authorizing them to search for cocaine and drug-related

paraphernalia, the officers had a right to examine closets and

shelves, open drawers, and look into suspended ceilings, all

likely hiding places for cocaine.").

    In contrast, in United States v. Martineau, I concluded with

respect to Defendant Ennis that the scope of the search was not

reasonable.  I found there was "no basis to conclude" that the

defendant was hiding contraband in secret locations.  Police

nonetheless focused on a wall in the basement.  I found that "the

wall behind the tapestry looked intact, undamaged, and

unremarkable.  The tape [a police re-enactment of the search]

does not show why any searching officer would have looked beyond

that intact wall to remove wall boards." United States v.

Martineau, No. 03-10298 at *17 (D. Mass. Feb. 23, 2005).  The

defendant in Ennis stated that it took two days to clean-up and

repair the walls after the police search.

    No similar damage is alleged with the floor here, and an

officer testified that he lifted the boards with his fingers --

no tools were required.  Furthermore, although nothing indicated

that the floor contained a hiding place, the pattern of the floorboards distinctly suggested that there might be an access space under the floor.

Nor did the search of 41 Weston Street involve any permanent damage to the floor.  Detective Khory testified that he found the gun within approximately five minutes of entering the house and that the compartment was "easy to locate." (Hr'g Tr. 44, June 9, 2006).  Although police cannot indiscriminately tear through a house in search of small amounts of drugs, these facts do not suggest an especially intrusive search.  I am therefore obliged to conclude that the search here was reasonable and did not exceed the scope of the warrant.

### C.  **Seizure of the Gun**

The officers' decision to seize the gun found several feet under the floor is even more troubling.  The warrant authorized a search for drugs and materials and paperwork associated with the production and distribution of drugs.  It made no mention of firearms.  See Gov. Ex. 2.[8]

---

[8] The warrant authorized a search for:

> [H]eroin . . . and all controlled substances which have been manufactured, delivered, distributed, dispensed or acquired in violation of Chapter 94C, M.G.L.A. All materials, products, and equipment of any kind which are used, or intended for use, in manufacturing, compounding, processing, delivering, dispensing, distributing, importing, or exporting any controlled substance. . . . All books, records and monies used [for those purposes]. . . . All money which is the proceeds of the sale of any controlled substance . . .

1.  **Plain View**

Police could seize the gun if it constituted contraband in plain view.  To seize an item in plain view without a warrant, the government must establish that 1) the officer's presence at the point of discovery was lawful, 2) the officer had a lawful right of access to the object itself, and 3) the "'incriminating character [of the item seized] must also be 'immediately apparent.''" United States v. Rosa, 2004 WL 937334, *1 (D. Mass. 2003) (quoting Horton v. California, 496 U.S. 128, 136-37 (1990)).  The government has the burden of showing that the plain view exception applies.  See United States v. Rutkowski, 877 F.2d 139, 141 (1st Cir. 1989).

The   inquiry here is the third one: whether the illegality of the gun was "immediately apparent."  In Rutkowski, police had a warrant to search for stolen jewelry, guns, and coins.  An officer found a coffee can filled with metal, and police knew that platinum had been recently stolen from a post office.  The question was whether it was "immediately apparent" that the metal was the stolen platinum.  The First Circuit noted:

> When an officer spots an object not described
> in the warrant, authority to seize depends
> upon knowledge – the extent to which bits and
> bytes of accumulated information then and
> there fall into place. . . . [T]he officers'
> discovery of the object must so galvanize
> their knowledge that they can be said, at
> that very moment or soon thereafter, to have

---

Gov. Ex. 2.

> probable cause to believe the object to be
> contraband or evidence.

United States v. Rutkowski, 877 F.2d at 142.

Police need probable cause to believe the evidence is contraband, a requirement, the Court noted, that is "not a toothless tiger." The standard is an objective one, calling into focus more than mere hunch, guesswork, and cop-on-the-beat intuition. The prosecution must show that the "'facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband . . .'" Id. (quoting Texas v. Brown 460 U.S. 730, 762 (1983)).

In Rutkowski, the Court upheld the suppression of the evidence, noting that possession of platinum is not, in itself, illegal and that the officer who found it did not immediately identify it as platinum. In that case, the inculpatory nature of the metal was not apparent at any time during the search and was not fully realized until two days later.

Similarly, the Sixth Circuit affirmed a district court's finding that a gun found during a warrant-based search for jewelry and a television was illegally seized and should be suppressed. The Court noted that police were not able to immediately determine that the gun was illegal and an ATF agent on the scene said that the gun did not violate federal law, though he was not sure whether it violated state law. See United States v. Szymkowiak, 727 F.2d 95, 99 (6th Cir. 1984) ("[E]ven if

probable cause of criminality was 'apparent' to the ATF expert, such probable cause clearly was not 'immediately' so.  The record in this case is clear that the executing officers who discovered the weapon could not '*at the time*' of discovery determine whether its possession was unlawful."  (Emphasis in original)).

For the illegality of the gun to be "immediately apparent" here, the government would have to establish either: 1) that the gun was a tool of the drug trade and hence, in the context of a search for drugs, was reasonably believed to be illegal; or 2) that something police knew about the gun or Handy made the gun contraband.

### a.    Tools of the Trade

A major issue is whether the police could legitimately seize the gun based on the "tools of the trade" case law.  In particular, the question is whether *any* amount of drug dealing, no matter how small, justified a gun seizure as a tool of the drug trade.

In United States v. Rosa, police had a warrant to search an apartment where police believed a drug distribution ring was in operation.  During the search, police seized more than 90 grams of marijuana and $5000 cash.  In a closet, they also discovered a handgun.  The officer inspected the gun to secure it, found it loaded, and removed the bullets.  While unloading the gun, the officer noticed that the serial number had been obliterated.  The

Court held that the officer properly handled the gun in order to secure it and, in securing it, the illegal nature of the gun became immediately apparent. United States v. Rosa, 2004 WL 937334, *2 (D.Mass. 2003).  The Court noted that the seizure was also justifiable based on a "tools of the trade" justification. Judge O'Toole observed:

> 'It is now recognized by us and other
> circuits that firearms are one of the tools
> of the trade of drug dealers.  Guns, like
> glassine bags, scales and cutting equipment
> are an expected and usual accessory of the
> narcotics trade.  Any reasonably competent
> police officer who discovered firearms while
> searching for drugs would be immediately
> aware of their evidentiary significance.' It
> follows that the incriminating nature of the
> handgun. . . was immediately apparent given
> that the officers had previously found in
> [defendant's] bedroom evidence of illegal
> drug trade.

Id. at 3 (quoting United States v. Caggiano, 899 F.2d 99, 103-04 (1st Cir. 1990)).

The court in Rosa did not specify the origin of the probable cause for the warrant, but the opinion states that the police believed the apartment housed a drug distribution operation.  The Caggiano Court, quoted in Rosa, made its "tools of the trade" finding in a case where an informant had observed multiple drug transactions and defendant had shown the informant a gun, so police knew the defendant had a gun but had chosen not to include firearms in the warrant application.

To be sure, the earlier First Circuit cases that developed the "tools of the trade" doctrine dealt with large drug conspiracies not the small possession amounts found here. As the Court observed in United States v. Hinds, a case involving the purchase of multiple kilograms of cocaine:

> We have only to read the daily newspapers or watch the news on television to recognize that narcotic dealing and guns go hand in hand. We agree with the observation in United States v. Wiener, 534 F.2d 15, 18 (2nd Cir. 1976), cert. denied, 429 U.S. 820, 50 L. Ed. 2d 80, 97 S. Ct. 66 (1976): "Experience on the trial and appellate benches has taught that *substantial dealers in narcotics* keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment." In United States v. Cresta, 825 F.2d 538, 554 (1st Cir. 1987), cert. denied, 486 U.S. 1042, 100 L. Ed. 2d 618, 108 S. Ct. 2033 (1988), we noted that *in large-scale international smuggling ventures* "guns have become tools of the trade almost to the same extent as scales, cutting equipment and other paraphernalia."

856 F.2d 438, 443 (1st Cir. 1988) (emphasis added).

More recently, the First Circuit declined to reach the issue of whether the "tools of the trade" doctrine applies in smaller scale drug cases. The Court wrote found it "unnecessary for us to address whether an extensive drug conspiracy is a prerequisite to the applicability of the 'tools of the trade' doctrine, because here we have a significant conspiracy, complete with two drug dealers, a considerable number of regular drug customers, several drug runners, and the deliberate transportation of drugs

across state lines from Massachusetts to Maine." <u>United States v. McGuire</u>, 389 F.3d 229, 230 n.4 (1st Cir. 2005) *vacated on other grounds*, 544 U.S. 946 (2005). <u>See</u> <u>also</u>, <u>United States v. Riley</u>, 2006 U.S. App. LEXIS 15584 (2d Cir. 2006) (observing that "we have taken judicial notice that, *to substantial narcotics dealers*, guns are 'tools of the trade'" (emphasis added)).

This case, however, raises the issue squarely. Here, the only evidence was that "Joe" made two extremely small heroin sales to the CI. The question is whether this is enough to demonstrate that "Joe" was a drug dealer involved in any kind of established drug trade, let alone one for which a gun would be a standard "tool." While I am troubled by the application of <u>Rosa</u> to the case at bar, I have no confidence that the line I would draw excluding the evidence where the scope of the drug operation is so small - is one that the First Circuit would adopt.

### b.    <u>Inherent Illegality</u>

Seizure of the gun would also have been legitimate had the weapon itself immediately revealed its illegality. While it is not clear whether the gun was found before or after the drugs, Detective Khoury testified that the firearm was not found anywhere near drugs or other contraband. (Hr'g Tr. 44, June 11, 2006). The serial number was intact, and nothing about the gun itself was inherently illegal.

At the time he seized the gun, Detective Khoury did not have any information that the gun was illegally possessed, nor did he have any information tying the gun to drugs. Id. at 68. He "wasn't familiar" with Handy at the time, so he had no reason to believe Handy was a felon for whom possession of the gun would have constituted a crime. Id. at 68-69. As the court observed in United States v. Bater, gun possession alone is not a probable crime justifying seizure of the weapon if police did not know that defendant was a felon. See United States v. Bater, 830 F.Supp. 28, 39 (D. Mass. 1993). In addition, there was no clear reason to tie the gun to Handy. Police knew from the warrant application that the house belonged to a woman, Shirell Carrigan, not a man.

On the other hand, Handy was found in the same room as the gun, although it was several feet below the floor and underneath the floorboards. Both women's and men's clothes were found in the bedroom, along with mail bearing Handy's name.

On this basis - and again – just barely, I find that the police had probable cause to tie Handy to the gun.[9] See Arizona

_____

[9] Lieutenant Thomas, who was in charge of the investigation, testified about the limited knowledge police had gleaned from a Board of Probation report they accessed during the search:

> Thomas:    [W]e seized the firearm, we identified him
>            [Handy], determined who he was, that was
>            one of the factors, no license to carry,
>            we determined that he had no license to
>            carry and he was charged with that
>            offense.
> A:         The Board of Probation record, does that
>            indicate whether a person had a license to

v. Hicks, 480 U.S. 321. 326 (1987).  I therefore find that the
illegality of the gun was immediately apparent; the police had
probable cause to seize it under the plain view doctrine.

### 2.    Public Safety

The safety of the officers or the public constitutes another
potential rationale for seizing a weapon.  In United States v.
Timpani, the First Circuit allowed the temporary seizure of a
weapon to secure public safety.  665 F.2d 1 (1st Cir. 1981).
There, the crimes being investigated were "serious" and
"[s]trangers were working in the house and might have entered the
room." Id. at 5 n.8.

Here, however, although the gun was loaded, it was covered
by a leather case.  It could have been left under the floorboards
where Detective Khoury had found it – out of arms' reach; Khoury
needed a hanger to access it.  Handy had been cuffed and brought
downstairs and his son, Jekeith Carrigan, had left the house.
With no one else home, and the weapon under the floor, it could

---

|     |                                                             |
|-----|-------------------------------------------------------------|
|     | carry or a license to possess?                              |
| A:  | No, it does not.                                            |
| Q:  | And in fact, because if indeed this was                     |
|     | his home, all he needed was an FID card?                    |
| A:  | Correct.                                                    |
| Q:  | It could have been anybody in the house                     |
|     | could have had an FID card, and that gun                    |
|     | could have been perfectly legal; is that                    |
|     | accurate to say?                                            |
| A:  | Correct.                                                    |
| Q:  | And then it wouldn't have been a crime for                  |
|     | that gun to be there; is that accurate?                     |

(Hr'g Tr. 121, June 11, 2006).

not reasonably be construed as a threat to the safety of the public or the officers.

### D. <u>Seizure of the Mail</u>

Police seized three pieces of mail from drawers of the bedroom bureau during the search. Several officers testified, and the government argued, that this seizure was justified based on the need to show Handy's "custody and control" over the gun found in the same room. Again - and barely - I find that the seizure of Handy's personal paperwork was legal.

## III. <u>CONCLUSION</u>

I find that the warrant, grounded in McDonald's affidavit about two drug purchases by a confidential informant, was based on probable cause. The scope of the search, although a stretch, was within the zone of reasonableness.

As to the firearm and Handy's personal mail, I find that the seizure of these items, which were not mentioned in the warrant, was also justified. Accordingly, I hereby **DENY** Handy's motion to suppress [document #21] both the gun and the mail.

**SO ORDERED.**

Date: May 11, 2007        */s/Nancy Gertner*
                        **NANCY GERTNER, U.S.D.C.**